Good morning ladies and gentlemen. The first case this morning is Berger v. NCAA and Mr. McDonald. Thank you. Good morning. May it please the court. We are here this morning upon an appeal of a motion to dismiss Granite and Southern District Indiana Community Outlets Division. This case presents two questions. First, do NCAA student-athletes meet criteria for employee status under the FLSA, as do, for example, student ticket takers, attendants, and food concession workers at NCAA U.S. Second, do joint enterprise operations of the NCAA and its member schools meet criteria for joint employment's control of student-athlete labor under the FLSA? Because it is well settled that employee status and joint employment are both fact-intensive inquiries, neither question can be answered on a motion to dismiss before there has been fact discovery and then that fact discovery has been applied to appropriate test. Defendants have not and cannot dispute these bedrock principles of labor law. Instead, they ask this court to ignore them. In fact, all but one of the FLSA cases principally relied upon by the defendants was decided after fact discovery at the summary judgment stage. I'll address that singular case in Sky Key v. Peters shortly. No case decided at the summary judgment stage or trial after fact discovery is procedurally relevant on a motion to dismiss. For that matter, none of the antitrust, agency, property interest, or workers' compensation cases cited by defendants is substantively relevant in this case under the FLSA. Now, on the question of employee status, defendants relied upon two frivolous arguments. Extending the rationale for dismissal in Van Sky Key v. Peters and the first a 70-year-old Supreme Court precedent, Skidmore v. Swift and Company. Regarding Van Sky Key, in that case, this circuit affirmed dismissal of a prisoner's complaint for employee status because of the 13th Amendment's specific and solitary allowance for unpaid involuntary servitude of prisoners. As this court well knows, the 13th Amendment reads in part, quote, neither slavery nor involuntary servitude except as a punishment for crime whereof the party shall have been duly convicted shall exist within the United States, end quote. The 13th Amendment dictates that a prisoner can prove no set of facts to establish employee status under federal law. Defendants urge this court to give NCAA-defined antitrust rules the same effect and deference as the 13th Amendment. Their argument is frivolous and beyond the pale. Counsel, I wouldn't use those words too widely here. Understood, Your Honor. Student-athlete labor does not belong to defendants as prisoner labor belongs to a prison or slave labor once belonged to a plantation. Could we talk about the statute earlier? Obviously, employee, employer, employee tend to be certain, right? I'm sorry, I don't understand the question. Employee is defined in terms of employment by an employer, right? Correct. And employer is defined as somebody who employs an employee, right? That's the essence. So it would seem to me that the critical definition is employee, which includes to suffer or prove to work. I wonder if you could focus on the word work here. And I think of it in terms of its opposites. And it's most obvious opposite here is play. Well, Your Honor, the point, I think, of the issue that the motion is at this stage is that the only way you can determine whether or not someone is an employee or an independent contractor or a volunteer, which is a classification under the Act, is to apply appropriate tests. And the only way you can do that is to first develop the facts. What's the appropriate test here? I believe, Your Honor, the appropriate test is a primary beneficiary test articulated by the Second Circuit in GLAD versus Fox Searchlight Pictures, Incorporated. And that was for interns who, in essence, are doing the kinds of work that other people would be employed to do if they had an interest. Well, actually, Your Honor, there is no intern test as such under the Act. The Act is only determined based upon employee, independent contractor, or volunteer. The test, in other words, is not determined by the label. It's based upon the classifications in the Act. So, for instance, you may apply it in the intern setting. Or, for instance, as this Court once did in Lorenzen, when they discussed migrant laborers, for instance, there was no migrant laborer test. The test was whether or not they were employees. They were migrant laborers regardless of whether they were employees. In the case of GLAD, there were always interns. The question was whether or not there were interns that needed to be paid because the Act obligates you to pay if someone is found to be an employee. Well, let me ask you about the primary beneficiary test because we live in an economy, in a society, where most things that happen are done by mutual agreement, right? Yes. And presumably, things done by mutual agreement are mutually beneficial, right? Well, so it probably is a primary beneficiary. Yes. Well, how do we tell? Well, again, Your Honor, that's the point of why we are asserting that this case should not be decided to motion as misstaged. The only way to tell is to apply a test after you have facts. And our searching here is that this is premature at this stage because there's so many facts that you think you want to develop that wouldn't make a difference. Well, first of all, when you look at the actual test, let's say it's a primary beneficiary test, which the district court judge actually suggested was a good test, but this circuit has not adopted, although the Northern District of Illinois has used the case at least once in this circuit. You look at, for instance, the issue of, in that case, the primary beneficiary test is really aimed at trying to differentiate between academic or educational experiences, which is what defendants of certain utility sports are part of, and compensable work. And so you look at, for instance, whether or not there's academic credit. You look at, for instance, whether or not it's part of an academic actual program. Right. Let's focus on athletics. Sorry? Let's focus on athletics. Well, that's the point, is that the facts we think you would develop would show that the NCAA athletics, you don't get academic credit for it. They don't contribute to an academic program. They don't. In fact, they actually interfere with someone getting a good education, as the defendants of the union recognize in their own constitution and bylaws, when they talk about limiting participation to 20 hours a week, which there's some dispute about whether or not that's actually the limit that's applied. But that's very similar to, for instance, work-study. In work-study, there's a concern that's in the regulations for work-study, that if you don't limit it to 20 hours a week, it can interfere with someone getting a good education. So these are facts that could be developed. And the whole point of, again, disputing dismissal at this point is that we haven't had a chance to do that. And I think one of the important points that should be made, again, it's very rare. And in fact, again, the only case they relied upon, and the only case I think anyone has cited in this case, where you had a dismissal at this stage of an FLSA case, was Mitzky v. Peters. In that case, the reason why it was a dismissal is because there is no set of facts. It doesn't matter what a prisoner says. Under federal law, because of the 13th Amendment, because the 13th Amendment says that there's unpaid voluntary servitude if a prisoner is allowed, then you can prove no set of facts regardless of what you assert. In fact, in that case, the circuit talked about that applying a test would have been useless because the result was already predetermined by the Constitution. There's nothing here like that. They've asserted their inability to define any terms and rules of that level. They clearly are not. There's no FLSA exception for amateurism. It doesn't even appear in the statute. The word amateur does not appear in the statute of the FLSA. And so they cannot make themselves essentially a super legislature above Congress and thereby frustrate the purpose of the FLSA. Can I ask you, does your argument depend upon the profitability of college sports? It actually does not, Your Honor. Here's the reason why. Revenue generation has never been the hallmark of employee status. I mean, it's kind of interesting. We're all here. A lot of us are lawyers. Those of us who work in-house at some point, or I'm sure many of us remember the concept of a cost center. In-house department in a corporation or in-house department in a university. In-house council, if you're a cost center, you're not generating revenue for the corporation, but they still have to pay you because you're still an employee. So revenue status, revenue generation is not a hallmark of employee status. Okay. Can we go back to 1938? Okay. If we go back to 1938, then let's be originalists for a moment here. What evidence or indications do you see that the Congress that adopted the Fair Labor Standards Act would have intended college athletics to be? We don't really know. I mean, I think that's the act. Isn't that what you said? No, I don't think it is, Your Honor, because if you look at the issue of, for instance, tradition, which is something that they have asserted. We're talking about a statutory interpretation question, and we're going back to the Congress that enacted that statute. What evidence is there that they would have thought that amateur athletes who choose to participate in college sports were actually employees? Your Honor, the record is bare. It's not a question of the record. This is a question of law, how to interpret the statute. Can you direct me to anything? Your Honor, I can't direct you to anything specific in the statute other than say that the statute's definition of employee is broad and has always been stated. The key concept, I would suggest, is work. And because of that, obviously we know the Fair Labor Standards Act was written broadly in a number of ways to try to prevent evasion and exploitation of people we would all recognize as employees. That's not so obvious here. And so the question is, in essence, why is this form of play appropriately treated, in your view, as a form of work under the statute, and why would Congress have thought so? Okay. Well, first of all, I don't know if I would necessarily call it play, because there's clearly performances being provided by the athletes that the defendants are benefiting from. When you, for instance, look at that and say, okay, they're being strictly supervised. I'll use this as an example. What's the common understanding of the term work in the context of this statutory scheme, which is it's a labor law? Right. So let's think of it in that sense. Never mind the text. Put those aside. What is the meaning of the word work in the context of this statutory scheme? Well, I guess it's difficult for me to take it outside the context of a test, because— I'm asking you to, so try, okay? I will. It's the notion that, again, that you are being strictly supervised, or supervised by someone who has the right to direct what it is you're doing and the goals you're trying to achieve, and that that person is the primary beneficiary of the— How much are you tethering that to the meaning of the term in the context of this statutory scheme? I think we should focus on the statutory language, to suffer or permit to work. I guess, again— Not issues of control, et cetera. Those kinds of tests are important only in the context of an employee or a putative employee who actually does work, in the traditional sense of that term, for two different employees, for employers. And you have to figure out who is the employer for purposes of this statutory scheme. Here, in the context of the claim that you're making, those kinds of tests just don't make any sense. Well, I guess I would ask the question, if we're not going to use a test to determine what work is, then it seems like we're just tied to what our opinions are of tradition or custom. And I guess the concern would have to be— That's the meaning of the word. Well, the word, again, as you've obviously pointed out, is to permit to suffer or permit to work, is to say that someone is— There is a relationship whereby someone is a primary beneficiary. They're receiving some benefits, primarily economic, where they have the right to direct and control the other individual. The other individual is not doing it— Again, this is where the tests come into play. They're not receiving the case of this in context, the concept of an educational institution. They're not receiving a significant academic benefit from it. They're not getting credit for it. It's not part of an academic program. They're doing something that is non-academic in nature. The employer is benefiting from it financially, in this case, quite a bit. Well, I thought I asked you earlier whether profitability mattered, and you told me no. Not to employee status, it doesn't. In other words, you can be someone— Well, here's the reason. It matters in terms of the benefit that the employer gets. Obviously, if you're an employer who's getting an extreme benefit financially, that goes to the issue who the primary beneficiary is. But being an employee doesn't mean that you have to generate funds for someone. We're talking here about Ivy League women's track and field, right? I assume that's not a revenue story. Well, I think there's some question about that, because that's one reason why I think, in a sense, this is premature. So profitability does matter? Well, again, I guess let me put it in—there's two different buckets here. It matters from the standpoint of when you talk about if the employer is giving the primary beneficiaries, if the employer is getting a benefit here. It doesn't matter from the standpoint of— So what would happen? Well, the benefit, in the case, for instance, it could be something like—and you mentioned the complaint. It can be fundraising off of these sports. In other words, it's not just a matter of how much money you make at the gate. It's not a matter of how much money you might get in terms of licensing or broadcasting. It's also an issue of how you use it. Every time you see commercials during an NCAA event for an educational institution, they never advertise under any other circumstance. They use these programs as a collective to fundraise off of boosters and donors. The whole concept of school spirit is always wrapped in the idea of a mascot or a fight song, which means nothing if you have no athletics program. So there are benefits that are both tangible and intangible that accrue to the employer, in this case, the universities. The reason why I say that it doesn't matter in terms of employee status is it's not a requirement of employee status that you be someone who generates revenue in the strictest sense. For instance, a work-study student who works in a cost operation, such as, say, building maintenance or something of that nature, a janitor, for instance. A janitor doesn't, in the strictest sense, generate revenue, but it's a necessary part of an operation that the school, in this case, has undertaken. And so that's why I want to touch on this issue. Just so that I get this clear, do you want to rely on both tangible economic benefits and intangible benefits in evaluating this question of primary beneficiary, right? Well, I think that's a fair thing to do, although I think that one of the things discovery would show, especially when you start looking at issues of how the programs are actually used, I think you'll find that the tangible benefit is far in excess of what has typically been discussed. I mean, that's, again, kind of, I guess, our overall approach to this. The reason why it's premature to dismiss this is because we don't know a lot of the facts that this could be developing. College athletics are under microscopic examination public. So what do we know about benefits to the athletes who participate as students? Well, that's part of the issue, again, is that we don't know what the benefits are. And if there are any, for that matter, then counteract those or approach those for the university. It would make a difference, counsel, if, for example, athletics are tied into the academic program for people studying, if I pronounce this correctly, kinesiology or physical therapy programs or something like that. It could, if that were the case, but it's not. And that's, I mean, there's not a requirement that someone who participates in an incident would explore. No, of course not. And so that's why the link is not inextricable. So under your test, would some people on a team be employees and those who are in a kinesiology major would not be? No, that would not be a distinguishing point because, again, the actual participation in sports is not related to, you can be an athlete and either be in kinesiology or some other discipline or not. It's not a requirement. It's not something that actually helps towards. In fact, again, it actually, the record suggests at this point, even by their admission to their constitutional bylaws, that it actually goes against someone's ability to do things. I'd like to ask you a couple of other questions about just how far your reasoning goes. Okay. This is Division I. Would your logic apply to Division II and III? I think it probably would, Your Honor. And what about to college musicians or college actors and actresses or college dancers? Your argument extends to those extracurricular activities as well because those programs are often open to the public. Everybody can buy a ticket to the school musical, anyone in the university town. And you don't have to be a music major. Right. There's actually some very significant difference in this case. Those student-run groups, because they are not strictly supervised by full-time employees of the university who are well-paid to do that. Oh, they often are. They often are. They're not. You have advisors. Surely the level of pay for the coaches or conductors doesn't control the FLSA issue, does it? No, it does the issue of control. The individuals you mentioned, for instance, who are in the band or other things, those are student-run groups. By definition, they have— What about Indiana University? It's well known for its music school, which has many voluntary things that people belong to but are supervised by a professor. It's not their full-time job. And again— Well, that's a certain law. It's a professor's. I'm sorry. I didn't mean to interrupt. I know that I'm running short on my time. I just wanted to make the point, as I do in the brief, that the defendants identify various different groups of student-run groups. And by that, they clearly mean it. I think that even the handbook that they refer to suggests this. These are groups that— There's elastic sports, right? The handbook? That's part of it, with club sports. Club sports that are— That's your limitation, right? I'm sorry? That's your limitation. Well, I phrase the limitation—the phrase in the handbook is interscholastic sports, correct? That's correct. Okay. I've got to ask about high school sports here, right? Because your reasoning, you think, would extend to Division II and Division III. Indiana, I'm told, has 13 of the 15 biggest high school basketball gymnasiums in the country. Thousands of people are seated. Sometimes the capacity exceeds the population of the town. A lot of money changes hands. Those basketball players are strictly supervised. They're controlled. Are they employees? I don't think they are. Why not? Well, at that point, I think there's a distinction between— Well, first of all, there's a distinction on the level of regulation. NCAA sports have a 400-page manual. There is a— HSAA has a pretty elaborate set of rules. I may not be quite as detailed as the NCAA, but is that the difference? Well, to be honest with you, I'm not familiar with their regulations. And I say that I don't think they would be employees, but to be honest with you, I have a hard time necessarily making a distinction because I don't know what the facts are, which, again, I think is the point here. Okay. How about Texas football players? There's a $60 million high school football stadium under construction. Again, I think— Tens of thousands seating capacity. Again, I think that what you'd have to do in that situation is develop the facts independently of the fact you developed an NCAA situation and compare them based upon applying a test. I think the thing that concerns me is this notion that our ideas of customer tradition, which we know have some dubious records in terms of determining whether or not someone should be protected under federal statutes, that we allow customer tradition to replace the orderly application of facts to test that we have developed for the purpose of determining if someone is an employee or not. I think, again, the only case that they have cited where someone had a complaint dismissed at this level was Van Skuyke versus Peters. I think it's clearly distinguishable because of the terms of limits in terms of— What we're talking about here is a question of statutory interpretation, right? And so I would think that general practices would be a pretty good clue as to what Congress meant when it were at work. But if that's the case, then, again, by tradition, interns, all internships were pretty much unpaid until the recent tests were applied and you took facts and applied them to tests. There's a lot of things that are done by tradition, even if you look at this instance of whether or not, in the Lorenzen case, migrant laborers are employed or not. This circuit found that there were employees. Another circuit found that there weren't. And that was based upon applying facts to a test. If you rely upon tradition alone, there are a lot of things that don't fall necessarily in the understanding of work at the time of the State of 1938 that, again, today, based upon today's standards, we would look at today's economy. We say, yes, this is work, and therefore someone should be paid. The intern cases are emblematic of that, although, again, I would say that they're not intern tests because there's no such thing as an intern test. There's only an employee test to determine if someone is an employee and a contractor or a- How do you determine who's an employee? Again, you apply the test. You take the facts of the relationship as it's been developed, and you say, okay, here's a test, and you determine which test is the most appropriate test to apply based upon the context. And this is what the circuit talked about in Lorenzen, for instance. We take the test. One issue is not dispositive of the whole issue. We look at the test in its totality, and we go through the test, and we say, okay, this aspect applies towards this, this aspect applies towards that. And then you see what the result is, and that's the reason why, frankly, all of the cases that they've cited are decided on the summary judgment level because there has been an application of facts discovered to a test. Again, it seems to me premature to judge without knowing the facts, without having a test. What would you consider to be a disputed fact that would be resolved by an introduction of evidence? They say, for instance, that it's related to academics. I think that- Who? They say it's related to academics. I think that the evidence clearly would show that academics are actually hurt by participation in sports in terms of even their acknowledgement in their, again, their constitution and their bylaws. There's no academic credit that's given for this. You look at the level of control. Again, instantly athletes are the most strictly controlled individuals on college campuses, far more so than work-study students, far more so than people who we acknowledge are employees currently. And so these are issues that they've disputed already in their papers, and I apologize, my time is up. That, I think, will be developed. I'll give you some more time at the end. Thank you. Mr. Goldstein? We have kids in court. There are two overarching issues in this appeal. With the court's permission, Mr. DeCamp will focus on the joint employment issue, and I will address whether Division One athletes are employees at their own schools. Plaintiff's complaint alleges that three members of the women's track and field team at the University of Pennsylvania are employees of Penn under the Fair Labor Standards Act. The district court's rejection of that claim was correct as a matter of ordinary English, and also consistent with judicial precedent, statutory purposes, and the long-standing views of the agency charged by Congress with interpreting the act. Mr. Goldstein? Are there any other cases presenting this issue? Your Honor, I'm not aware of other cases that have penetrated this issue. I believe so. In the FLSA context, with one indication, Your Honor, there was a complaint filed yesterday in the Northern District of California making allegations quite similar to these on behalf of a putative class of football players naming, if I'm recalling correctly, just the NCAA at the Pac-12 Conference. But to the extent that Your Honor is asking about decided cases, I'm not aware of any. I'm not asking about pending cases as well. Other than the one I just mentioned is the only one I'm aware of, Your Honor. So starting with plain English, both the Supreme Court and this court have instructed that the scope of the FLSA's coverage is in large measure a matter of common English and common sense. So in Tennessee Coal, the Supreme Court explained that the key statutory terms, such as work, have their ordinary everyday meaning. In the court's phrase, the meaning with which they are, quote, commonly used, unquote. In this court, the advanced guide similarly explained that what the court called common linguistic intuitions may provide the best guide in delineating statute's reach. Applying those precedents here, Your Honor, leaves no doubt that dismissal of the complaint was proper because playing a sport for one's college is not remotely within the ordinary meaning of the term work. A college student would not, for example, say to a friend or relative or anyone else, I work for the Penn track and field team or I'm employed by the Stanford golf team or Stanford. Indeed, saying that, Your Honor, would be affirmatively misleading, affirmatively confusing. The listener would probably think that the athlete was the assistant coach or the strength trainer or someone who really is employed by the school and the team in the ordinary sense of that word. So here, common linguistic intuitions as advanced guide are strained to say that Division I athletes are employees of their school. And that is why every court to address this question, not in the FLSA context, but in the context of Title VII, workers' compensation, responding out superior, and similar theories, every court has concluded that student athletes, Division I athletes, are not employees of their schools. And so, of course, has the Department of Labor in this context, the FLSA context. For decades, the Department of Labor's field operations handbook, which this court and other courts have said is entitled to a certain amount of respect, a certain amount of weight from college. Why? Why? Because it is the agency charged by Congress with interpreting the statute and it has 80 years of experience interpreting the statute and presumably brings that to bear in authoring the field operations handbook. And what the FOH has said consistently for a number of decades is that college students' participation in activities generally regarded as extracurricular, including, as you were discussing with the plaintiff's counsel, quote, interscholastic athletics, close quote, is not work and does not create an employer-employee relationship. Now, plaintiffs have raised three arguments about that to the FOH. First, they say this court cannot rely on it because the district court deemed it not dispositive. That's not correct. This court can rely on it and confirm based on any ground properly presented in the record. The FOH certainly qualifies. Second, they say that skid-board deference cannot be given at the 12B6 stage. That, too, is incorrect. In the, for example, Federal Express v. Hollywoodton case cited in our brief, the Supreme Court gave skid-board deference, dispositive skid-board deference, to the EEOC in the case that had come up on 12B6. And finally, plaintiffs say that the term interscholastic athletics excludes NCAA athletics. Well, three points on that, Your Honor. First, I submit it's facially implausible the ordinary meaning of the term interscholastic is between schools. NCAA athletic contests are certainly contests between schools. How do you distinguish that with NAI? What's the difference? I'm sorry, Your Honor. I don't know what NAI is. Actually, it used to be the counterpart of the NCAA. It was an organization, collegiate thing, international student. I can't remember what the names were. You're not familiar with it? No. Mr. McCabe, is your question whether other amateur athletes are also employees under the Fair Labor Standards Act? No, I was asking for the difference between your organization, NCAA, and this other organization which looks to achieve the same thing, an organization outside the NCAA. Now, where you don't belong to the NCAA, you belong to this other. If you're not familiar with it, it won't do any good. Okay. I do apologize, Your Honor. The second point I was going to make about their argument regarding the meaning of the term interscholastic athletics is that their argument is inconsistent with the Department of Labor's failure for 20 years, indeed for 80 years, to bring any enforcement action based on NCAA athletes not being paid. Under this Court's decision in E versus Sterling Collegial Centers, under the Supreme Court's decision in Christopher v. Smith v. Klein-Beacham, that's an indication that there is no FLSA violation. Plaintiffs say that's not conclusive. It's not conclusive, but it is evident in some of the cases I just mentioned. And the third point regarding their argument is that it is refused by the plaintext of the FOH itself. So the plaintext argument is that the items on the list that includes interscholastic athletics, this is 10B03E, the easiest place if the Court's interested in looking, maybe pages 17 to 18 of Mr. McCann's brief, that list, they say, is items and criteria for being on that list, they say, is items that are student-run or activities that are student-run. But the FOH tells us differently. It tells us that the reason activities are on that list is that they are offered as part of the overall educational offerings of the university. So I'm looking at, again, this is 10B03E. It says that as part of their overall educational programs, schools may permit or require students to engage in these activities in the business of interscholastic athletics. So the FOH has long said that interscholastic athletics does not work, and that is correct. I mentioned statutory purposes. This Court in Van Dyke identified two, ensuring that workers can ensure minimum standard of living and preventing unfair competition. Neither is indicated here. There are no allegations in the complaint suggesting that NCAA Division I athletes, whether on the Penn track and field team or in other schools and other sports, cannot maintain minimum standard of living unless they are paid the minimum wage. And the second is unfair competition. There is no, to my knowledge, other amateur athletic league out there competing with the NCAA and, in essence, being undersold by the NCAA, not paying schools. Can I follow up on that a little bit? My memory is a little bit shaky on this, but I seem to recall some widely publicized stories about some Division I athletes who couldn't buy enough food to feed themselves. That, if I recall correctly, provokes some changes in NCAA scholarship policies, so as to allow some additional cash stipends to be provided. Is that right? Well, you may have referred to Judge Hamilton a couple of years ago, survived the Navy year, a player on the UConn basketball team, made allegations to that effect, and I believe you are correct about the changes that came in the wake of that. Obviously, we are talking about this particular complaint on there. I'm talking more generally, though. If the NCAA starts allowing payment of cash stipends as part of athletic scholarships, does that have any impact on how we should think about these issues for at least some categories of athletes? No, Your Honor. First of all, the Field Operations Handbook, 10B03E, says that these sorts of activities are not work even if there is a certain amount of compensation involved. So the Department of Labor has considered that precise question and concluded that it does not make a difference. And I do want to be clear, Your Honor, the NCAA does not pay cash stipends beyond the full cost of attendance, a federally defined term of all the expenses that athletes incur as part of being students as they are required to be. Your Honor, I wanted to make a point. Mr. DeCamp, I assume that's to protect amateur standards for purposes beyond the NCAA as well, right? I was with you until the end, Your Honor. Beyond the NCAA, it is to protect their amateur status, which is defined as not receiving pay for play, pay beyond the expense of what occurs in order to be a student at one university. One of the themes that you heard in this morning's argument was that we need more developed facts, and this is a fact question that has to go beyond a motion to dismiss. But it is not correct to say that any time a factual issue is implicated in the Supreme Court's decision to pass the 12B-6. So perhaps one of the essential fact issues, motive or intent, the Supreme Court's decision in Ashcroft v. Gateball indicated that very question, right? The issue was had a law enforcement official rounded up Arab Americans in the wake of 9-11 for legitimate law enforcement purpose or for based on racist discrimination as the plaintiff alleged. And the Supreme Court said, as it had said in Tuolumne, that if the factual allegations in a complaint, taken as true, do not exclude what the Supreme Court called an obvious alternative explanation that does not involve a statutory violation, then the complaint is not plausible and you don't get past a 12B-6. So in Tuolumne, in the trust case, the issue was the obvious alternative explanation was parallel conduct. How heavily do you want to rely on Gateball here? Your Honor, I'm aware of the divisions in the court and other local courts in the aftermath that they call about just exactly how to apply the plausibility standard. I don't think we need it, Your Honor. I think the factors I've already ticked off, the plain language, the Department of Labor's use of statutory purposes, and we provide a basis to affirm here. Well, right. This isn't a subjective inquiry in the sense of needing allegations sufficient to create a jury question on subjective intent. This is really an objective inquiry about whether, objectively speaking, this activity constitutes work. No question about it, Your Honor. And the court inquired of Mr. McDonald twice this morning what facts he would want to see, and I heard him say that there are disputes about whether it's related to an academic program. But he agrees that, for example, glee club and dramatics and publications and other activities that are also not related to academics or for academic credit is not work. So I don't think that is dispositive here. Your Honor, if I could wrap up with one word on leave to amend. The dismissal with prejudice should be affirmed for two independent reasons. One, as the district court said, there simply are no facts. It would be futile to say there are no facts that could be pleaded that would make for a plausible claim that women's track and field athletes at Penn or Division I athletes more generally are doing work. In fact, they are doing plays, as Judge Hamilton suggested at the outset. And number two, the issue simply has not been put before this court. In fact, in a doubling waive, the plaintiffs did not see leave to amend below their back waiving, and their briefs here do not see leave to amend on this issue. For those reasons, yes. If I could ask you, is this an appropriate case for us to try to decide the status of, let's say, Division I football and basketball players? So, Your Honor, what I would say is— I'm not going to be asked to, I understand. But I'm wondering whether the more prudent focus might be narrower. Judge Hamilton, it may well be, from my guidance to the court on it, would be the following. I think the arguments that I have put forward apply equally to all sports and all schools. But certainly to the extent the court disagrees or has uncertainty about that, that would not provide a basis for reversal in light of this complaint. And certainly, it would be well within the court's prerogative to simply address the specific context and the specific athletes provided here. I'll ask the court to affirm. Thank you. May it please the court. I think it's important to recognize that all of the arguments that have been made so far by the NCAA apply with even more force to schools that these plaintiffs did not attend. There is not a word of factual allegation in the complaint, beyond mentioning schools, in the caption about any control, any activity that these schools have with regard to the athletes at Penn. And so I think that's an important factor. There's no suggestion, for example, that Georgetown or SMU has any involvement in controlling the activities of Penn women's track and field athletes, selecting who makes the team, or anything else. There's simply no allegation. And the case law contains no precedent at all for this type of reach, where the allegation, in essence, is that different entities got together and talked about what they were going to do in terms of their own people, plaintiffs call them employees, we disagree, and that that alone is the nexus. There's not a case out there suggesting that when that is the structure, that there's an employment relationship. It would be like Burger King and McDonald's, franchises across the street from each other, agreeing to set practices in their own workplaces, but not exerting any actual control over what the other side does. It's, in essence, an argument about an unilateral agreement. There's no case law supporting that type of argument. There's no recognition in the case law for any type of conspiracy notion in the FLSA. The FLSA has broad concepts, broad definitions, but the case law doesn't go that far in the entire history of the FLSA. I'd like to come back to the point raised earlier about what did Congress in 1938 intend when it passed the FLSA. Again, common sense use of the term work, of the term employer, of the term employee, and the problems that Congress was trying to address in 1938 involved the Great Depression. It involved 20% unemployment around the nation. It involved people who were struggling in factories and fields. There's no indication in anywhere that Congress meant to upend amateur college athletics. That wasn't the problem that Congress was trying to address. This Court has, in numerous opinions, spoken about the policies behind the FLSA to provide minimal protections and labor standards, to prevent unfair competition, and, in some instances, to prevent unemployment. None of those concerns is implicated here. This is not a situation where, in the common province, as was mentioned earlier, someone used participation in college sports as a job. You go to school, you go to college to get a job afterwards. You do it to not go to work. Your alternatives are you go to work or you go to college. One doesn't see participating in these activities in college as work. And, related to that, the point raised is all about high school. And that brought to mind my sons in 10 and 11. They participated in youth sports. So where does it end? This argument has an eliminating principle, the theory that the plaintiffs want to proceed with here. And, especially when we've got schools here that have no factual nexus to the allegations and the complaint, but for their members of the NCAA. Mr. Buchanan, could you talk a little bit about tradition? And, specifically, a couple of contexts come to mind where, for example, we had a long tradition in this country that marriage was between a man and a woman. And that was overturned in a series of litigation a couple of years ago. We had a long tradition of segregated schools and other forms of racial discrimination in the country. And the courts ultimately concluded that, despite tradition, had a deal. Well, yes, Your Honor. I think the important distinction there is that the kinds of traditions that were in place were ultimately held by the courts to be inconsistent with our constitutional jurisprudence, whether it's due process or equal protection, rights guaranteed by the federal constitution. Here we're talking about a matter that is purely statutory. This is a creature of Congress as implemented and enforced by the Department of Labor. And I think that any change along those lines, and it would be a fundamental change to the treatment of an entire body of people that is tens or hundreds of thousands of people large, that ought to come from Congress and not from the courts. There's no constitutional imperative driving any decision that these people be employees or not. It's purely a creature of statute. And with regard to Van Stuyck that was mentioned earlier, I think it's important to recognize, too, that this court, in dealing with prisoner labor, and to be clear, no one is asserting that that is a factual analogy setting to what we have in this case. But what the court did there said that this was not a situation where the Seventh Circuit ruled that the Thirteenth Amendment compelled that outcome. What the Seventh Circuit said, what the court said in Van Stuyck is the economic reality of that situation of prisoners performing labor in a prison are not employees. That's not an employer-employee relationship. It's not about the Thirteenth Amendment, per se. There are other cases in prison context where work is being performed by prisoners outside of prisons where the Thirteenth Amendment does not trump. So to suggest that Van Stuyck is distinguishable as purely a Thirteenth Amendment case is simply not correct. The court focused on the economic reality, took a step back, and said, as a matter of common sense, this is not an employer relationship. Just as with the Callahan case that this court decided earlier this year regarding the taxi cab drivers in Chicago. While it was a summary judgment ruling, I think the logic of the court's opinion could just as easily have appeared in a decision affirming a dismissal at the 12B6 stage. It's also important to note that there are numerous cases, and we cite them in our brief, where courts have dismissed, for lack of standing, FLSA cases on the basis of no employment relationship or no pleaded or no plausibly pleaded employment relationship. We cite at least four of those cases in our brief. This is not new ground in terms of what courts do when plaintiffs don't allege an employment relationship and don't allege work with regard to a number of defendants in the case. For those reasons, I would submit that any of the schools, other than Penn, should be dismissed on the basis, and their dismissals should be upheld on the basis of lack of standing or pleaded employment relationship. Do you know what the NAIA is? I'm sorry, I have no idea. All right. I'll try Googling it. If I can follow up, is it true that you're talking about, and we've been focusing before on standing versus merits here, but over the last 10, 15 years, the Supreme Court has really restricted the scope of what is truly jurisdictional. And I haven't thought that through yet under the FLSA. But, for example, under Title VII, whether there's an employment relationship is no longer treated as jurisdictional. But here it's different because with the FLSA, nobody is a party to the case until they affirmatively become a party. There's a special joint mechanism in the FLSA. For plaintiffs, yes. For plaintiffs, yes. But you guys are defendants. Correct. But, again, the basic Article III principle, and we see this in an FLSA case law that we cite in our briefing, is that a defendant against whom there is no plaintiff asserting a claim, there is no case or controversy as to that defendant. And we cite those cases in our brief. Okay. Mr. DeCamp, one other thing I wanted to ask you about is how coaches are handled in the FLSA. In college athletics, obviously some people are very highly paid, but also my impression is that there are much, much lower paid coaches and volunteers. Is that right? There are certainly paid coaches, and I don't think there's any issue in this case about the status of paid coaches as employees of the university that are doing the job. But I'm thinking about volunteers or folks who get paid very, very little. I don't know whether it's minimum wage or not. If the folks who get paid minimum wage, I don't think there would be an issue about their employee status. I think I need to go back and get paid. There's more volunteer. Both are volunteer coaches. It is possible that there may be, and I don't want to speak for schools that I don't have familiarity with their specific facts, but as a general proposition, there may be volunteer coaches who, for example, are pursuing a degree at the school in kinesiology and sports medicine, and that may be, in effect, an internship for them because they're working on the kind of field that they, in the kind of area of endeavor where they ultimately want to pursue paid employment. In that kind of instance, there may be room for those individuals to be unpaid volunteers if that's part of their academic program. In the cases you cited, for example, there was a case, and I'm just familiar in the news media, rather than the case itself, a Northwestern football player. Does that have any bearing on this case at all? I don't believe so, Your Honor. It was decided only by the administrative law judge, and I think the board then reversed it. Exactly. It's a different statute. It's not a principle that the courts have endorsed, and even the NLRB, which has been very aggressive in pursuing asserting broad notions of employment, wasn't willing to go that far, and I think that's very telling. If there are no further questions, I'll conclude. Thank you, Your Honor. Thank you. I'll give you three minutes, Constance. Thank you, Your Honor. A few things in rebuttal. First, on the issue of joint employment, there is a case, North American Soccer League, which talks about a league where you have this member-share joint control based upon the operations bylaws. And here in this case, plaintiffs have cited several bylaws under which the NCAA and its member schools share essential aspects, control over essential aspects of student-athlete operations, and they haven't refuted any of those. And so, again, that's a factual predicate. Even though we haven't gotten to the stage of developing facts, we would assert that those facts alone, the bylaws we have cited show sufficient joint control over student athletes to meet the burden at this point, which should be guided by the Villareal case, regarding the fact that joint employment, like employee status, are fact-intensive entries. So, again, I would go back and I guess I really want to have an opportunity to answer any other questions you may have, because I know we kind of ran out of some time. Could you address the point that the Supreme Court made, Christopher, against the client Beecham, about a long period of conspicuous inaction under a particular statute as applied to understaffed and unemployed employees? Well, one of the things I did, and I kind of need to keep on going back to internship, but this is kind of the most recent example of FLSA litigation. While you see a large amount of internship litigation going on now since the Platt case, one of the things you also see, and you cite this in our brief, is that the Department of Labor has never really made it a priority to enforce it. It's always relied upon private litigants to go after this particular area because the Department of Labor has limited resources and they prioritize based upon other areas that they think that they are needed in, whereas they think private litigants can. Well, right. That's in the context of interns who are performing what has traditionally been recognized as work, and that's just not the case here. But I guess I would say this. If it was recognized as work, they would have been paid all these years, and the point of the recent litigation is that traditionally they had not been paid. It was only when they challenged and they took the facts of their... Right, but the services that they've performed are similar to what paid employees would perform. So it's so much closer to the key question about whether they should be compensated than this case where what student athletes do is not remotely comparable to what employees do. Well, there are, of course, professional athletes in this society, people who actually do do these things and are treated as... But that's not the right comparison. But we're talking about students and their relationship with their colleges. But again, I guess going to the point you made about that something being traditionally thought of as work, I guess the point is that performing athletic performance actually is considered work. It just has not been considered work in this context because we've always deferred to the NCAA's definition of amateurism, which has not been consistent over the years. For instance, they allow Katie Ledecky, who just won gold medals and silver medals at the Summer Olympics, to retain over $100,000 in prize money and still retain her amateur status at Stanford. Or they allow tennis recruits to make a certain amount of money before they come to school and retain their status as amateurs. Or they allow current student athletes to actually work in the summer as work-study summer camp counselors, and that has not affected amateur status. There is no amateur... The use of the word amateur has not occurred in the FLSA. This is entirely something that they have created, and we as a society, for some reason, have just deferred to them as a super legislature that gets to defy their own rules. Thank you. Thank you, Counselor. Thanks to you all, Counselor, in case you were given any advice.